878 F.2d 1043
 Tyrone Antonio JOHNSON-EL, Arnold Fredrick Hamilton-El,
David Scott Hill-El, Appellees,
v.
Vincent C. SCHOEMEHL, Edward F. Tripp, L.T. Brown, Kelly
Parks, Appellants,
The City of St. Louis.
 No. 88-1252.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 23, 1988.
Decided May 22, 1989.
As Modified July 17, 1989.
 
 Elkin Kistner, St. Louis, Mo., for appellants.
 Mary B. Schultz, St. Louis, Mo., for appellees.
 Before HEANEY* and BOWMAN, Circuit Judges, and ROSS, Senior Circuit Judge.
 HEANEY, Senior Circuit Judge.
 
 
 1
 Plaintiffs have brought suit against the City of St. Louis (City) and officials of the City, seeking injunctive relief and $30,000 in damages. They allege the existence of specific conditions at the St. Louis City Jail (Jail) which violate the constitutional rights of pre-trial detainees. The individual defendants appeal a magistrate's decision denying them qualified immunity against these claims, sometimes allowed under Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). We affirm the magistrate's ruling, in part, and hold that at this stage of the proceedings summary judgment would be premature. For the reasons we set forth, we grant summary judgment in favor of Mayor Schoemehl. We stress that the other defendants may renew their motions when sufficient discovery has been conducted to enable the magistrate to assess the plaintiffs' ability to substantiate their claims.
 
 FACTS
 
 2
 Plaintiffs are three recent detainees at the Jail. Tyrone Johnson-El was detained for three months pending extradition to New York State. Arnold Hamilton-El and David Hill-El were both held in the Jail for over one year awaiting trial. During this time, they allege that they submitted or attempted to submit three grievances to prison officials regarding conditions at the Jail. They allege that their grievances went unanswered and that on one occasion they were threatened by defendant Parks for attempting to submit a grievance. In May of 1986, they filed a pro se complaint in United States District Court for the Eastern District of Missouri, alleging violations of their constitutional rights pursuant to the Civil Rights Act of 1871. 42 U.S.C. Sec. 1983.
 
 
 3
 In summary, plaintiffs allege that they: were denied meaningful access to a telephone, injuring their ability to communicate with counsel; were not allowed to worship as they chose; were not provided with adequate medical care; were given only very limited access to an inadequate law library; had outgoing legal mail misplaced or lost; were threatened for filing grievances; were subjected to rodent-infested food, living quarters and cafeteria; and were kept in closed areas during ineffectual but toxic pesticide spraying. They allege that these conditions either singularly or in their entirety violated their constitutional rights and amount to punishment of those charged but not convicted of crimes. Plaintiffs named as defendants Vincent C. Schoemehl, the Mayor of the City, Edward F. Tripp, the Commissioner of Welfare and Adult Correctional Services for the City, L.T. Brown, Superintendent of the Jail, and Kelly Parks, a guard.
 
 
 4
 The defendants filed a motion to dismiss, accompanied by affidavits in July of 1986, alleging that the plaintiffs' complaint failed to allege cognizable constitutional or civil rights violations. Judge Gunn treated it as a motion for summary judgment and denied it, because "there remain genuine issues as to material facts * * *." Order and Memorandum at 3 (Jan. 22, 1987). By agreement, the case was assigned to a magistrate with the right of direct appeal to us. On August 4, 1987, the defendants amended their answer to assert qualified immunity as a defense. They subsequently filed a motion for summary judgment claiming that the plaintiffs' request for injunctive relief was moot and that the plaintiffs' claims for money damages were barred by qualified immunity. Appointed counsel for the plaintiffs filed an amended complaint while the defendants' motion was under consideration, adding the City as a defendant. On December 30, 1987, the magistrate denied this second motion in its entirety. On January 25, 1988, the individual defendants filed a third motion directed at the new complaint on the same grounds as before because they were afraid that an appeal from the second order would be improper in light of the amendment of the complaint. Appellants' Brief at 4-5, n. 6. On January 27, the magistrate denied this third motion by a handwritten notation referring to his December order and memorandum.
 
 
 5
 On February 3, the individual defendants filed a notice of appeal and halted discovery. They argue that we have jurisdiction to review the magistrate's last order in its entirety because qualified immunity is a collateral matter and mootness is a pendant issue. We denied the plaintiffs' request to dismiss the appeal for lack of jurisdiction and heard oral argument on these pre-trial matters in September, 1988. The individual defendants have not yet been deposed and the interrogatory process is not completed.
 
 DISCUSSION
 I. Jurisdiction
 
 6
 Our jurisdiction to hear appeals from district court orders is limited by statute to those orders that are final or certified by the district court for our review. 28 U.S.C. Secs. 1291 and 1292. These laws express a strong policy against piecemeal appeals. United States v. Hollywood Motor Car Co., 458 U.S. 263, 265, 102 S.Ct. 3081, 3082, 73 L.Ed.2d 754 (1982). The Supreme Court has nevertheless construed these statutes to permit appellate review of a "small class" of "collateral" orders. Cohen v. Benefical Industrial Loan Corp., 337 U.S. 541, 546-47, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949). Collateral orders are those decisions that "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." Id. at 546, 69 S.Ct. at 1225. Cohen and its progeny have established four requirements for collateral order review: the order must conclusively determine the disputed question, it must resolve an important issue completely separate from the merits, the order must be effectively unreviewable on appeal from a final judgment, and the "order must presen[t] a serious and unsettled question." Richardson-Merrell, Inc. v. Koller, 472 U.S. 424, 431, 105 S.Ct. 2757, 2761, 86 L.Ed.2d 340 (1985) (quoting Coopers v. Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978)); see also Nixon v. Fitzgerald, 457 U.S. 731, 742, 102 S.Ct. 2690, 2697, 73 L.Ed.2d 349 (1982) (quoting Cohen, 337 U.S. at 547, 69 S.Ct. at 1226).
 
 
 7
 In this case, the district court's orders were not certified for review nor are they final orders. The effect of the district court's action is to continue the parties' discovery. Moreover, the individual defendants are not prevented from reasserting either claim later on in the proceedings, nor are novel issues presented.
 
 
 8
 A plurality of the Supreme Court has held, however, that the denial of a summary judgment motion based on a qualified immunity defense, to the extent that it turns on an issue of law, is always a collateral order. Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). The Mitchell plurality reasoned that the purpose of qualified immunity was to protect a government official not only from liability for her actions, but also from the rigors of litigation. Id. at 526, 105 S.Ct. at 2815. The value of the immunity would be lost absent immediate review of its applicability. Therefore, government officials who lose their motions for summary judgment on the basis of qualified immunity are now entitled to an immediate review solely to determine whether the plaintiff's claims allege a violation of clearly established law. Id.; see Runge v. Dove, 857 F.2d 469, 471 n. 1 (8th Cir.1988) (discussion of law and fact questions under Mitchell ). Thus, in Craft v. Wipf, 836 F.2d 412 (8th Cir.1987), and Drake v. Scott, 812 F.2d 395, reh'g denied and modified on other grounds, 823 F.2d 239 (8th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987), we considered whether the alleged property interests were clearly established. In Trapnell v. Ralston, 819 F.2d 182 (8th Cir.1987), and in Wright v. South Arkansas Regional Health Center, Inc., 800 F.2d 199 (8th Cir.1986), we reversed the denial of dismissals where, after discovery, the plaintiffs were entirely unable to substantiate that the defendants' discretionary decisions were improperly motivated. Harlow was an attempt to prevent complaints based upon "bare allegations of malice" from proceeding to trial. 457 U.S. at 817-18, 102 S.Ct. at 2737-38.
 
 
 9
 In this case, all the parties agree that we have jurisdiction to review the district court's denial of summary judgment on the grounds of qualified immunity. The individual defendants, however, go further, arguing that because a reversal on the issue of mootness as well would spare all the defendants from a trial, we should also review the district court's denial of their summary judgment motion on grounds of mootness. We decline to do so.
 
 
 10
 The exception created in Mitchell was a limited one, connected to the underlying purposes of the qualified immunity defense. In Mitchell, Craft, Drake, Trapnell and Wright, appellate review was confined exclusively to prima facie legal and factual issues. Mootness by contrast, does not implicate the underlying rationale for qualified immunity review--the protection of government officials from lawsuits where their actions might be discretionary, or where a reasonable person would not know that the challenged conduct was illegal. Harlow v. Fitzgerald, 457 U.S. at 818, 102 S.Ct. at 2738; see Chicago & Northwestern Transp. Co. v. Ulery, 787 F.2d 1239 (8th Cir.1986) (declining jurisdiction where these concerns were not implicated). A review of the qualified immunity claim by itself directly satisfies the policy concerns underlying the defense. The issue of mootness by contrast, pertains only to the injunctive relief sought against the City and the individual defendants in their official capacities. It does not affect the individual defendants' liability for damages.[1]
 
 
 11
 In this case, we will directly review the district court's decision with respect to the individual defendants' qualified immunity. Simply because a reversal with respect to mootness would relieve the individual defendants of the responsibility of defending the suit in their official capacities, does not mean that we will expand our review in clear conflict with congressional limits on our jurisdiction. U.S. Const. Art. III, Sec. 1; 28 U.S.C. Secs. 1291 and 1292; cf. Chicago & Northwestern, 787 F.2d at 1241. We do not understand Mitchell to stand for the proposition that government defendants are automatically entitled to appellate review when the reversal of any district court order would ease their burden or speed the end of litigation, nor is there any evidence that Congress so intended. Accord Huron Valley Hospital, Inc. v. City of Pontiac, 792 F.2d 563, 567-68 (6th Cir.) cert. denied, 479 U.S. 885, 107 S.Ct. 278, 93 L.Ed.2d 254 (1986) (reviewing qualified immunity claim but declining jurisdiction over defendants' claim of a state action anti-trust exemption). Instead, Mitchell stands for the more limited proposition that government defendants may enjoy early review only with respect to their qualified immunity claims, and according to the usual standards for reviewing summary judgment decisions. Runge v. Dove, 857 F.2d at 471; Fernandez v. Leonard, 784 F.2d 1209, 1213 (1st Cir.1986); see Palmer v. Tracor, Inc., 856 F.2d 1131 (8th Cir.1988) (summary judgment discussion). To hold otherwise would compromise the final judgment rule; for defendants could then make meritless qualified immunity motions as a means of gaining interlocutory review of all their claims.II. Qualified Immunity
 
 
 12
 The defense of qualified immunity is a means of protecting government officials from vexatious lawsuits questioning the discretionary performance of their duties. Harlow v. Fitzgerald, 457 U.S. at 814, 102 S.Ct. at 2736. It "accommodates competing social interests by ensuring that officials who 'knowingly violate the law' are held accountable, while officials who reasonably exercise their discretion" are protected. Warner v. Graham, 845 F.2d 179, 182 (8th Cir.1988). Actual knowledge of the law is not required; if the law is clearly established, the qualified immunity defense will fail unless the official "claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard." Harlow v. Fitzgerald, 457 U.S. at 818-19, 102 S.Ct. at 2738-39.
 
 
 13
 Our task on review is to separate those decisions that are discretionary from those that are required by clearly established law. Id. at 814, 102 S.Ct. at 2736. The test for qualified immunity at the summary judgment stage of a proceeding is an objective one: "to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " Runge v. Dove, 857 F.2d at 472 (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 531 (1987)). The plaintiff must demonstrate that the law is clearly established, for reasonable doubts about the state of the law implicate the central concerns of the defense. Davis v. Scherer, 468 U.S. 183, 197, 104 S.Ct. 3012, 3020 (1984); Clark v. Link, 855 F.2d 156, 160-61 (4th Cir. 1988). Cf. Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039 (1987) (to overcome qualified immunity, a plaintiff must allege that the official violated a clearly established right, the contours of which are sufficiently clear that a reasonable official would understand that what he is doing violates the right). The defendant bears the burden of proof with respect to all other elements of the defense, including whether there were extraordinary circumstances and whether he neither knew nor should have known of the relevant legal standard. Harlow v. Fitzgerald, 457 U.S. at 819, 102 S.Ct. at 2738.
 
 
 14
 In light of the posture of this case, we accept the plaintiffs' allegations as true. Runge v. Dove, 857 F.2d at 471 n. 1. We are only confronted with a "threshold immunity question" of law, whether the plaintiffs' rights were clearly established. Harlow v. Fitzgerald, 457 U.S. at 818, 102 S.Ct. at 2738 (prediscovery); Id. at 820-21, 102 S.Ct. at 2739-40 (Brennan, J., concurring).
 
 
 15
 A. Pre-Trial Detainees and Clearly Established Law
 
 
 16
 Pre-trial detainees are those individuals who the government has probable cause to believe have committed crimes. Gerstein v. Pugh, 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975). They are confined pending trial, either because there is cause to believe that they are dangerous or because they cannot afford to make bail. Unlike convicted prisoners, the state has no right to punish them. Bell v. Wolfish, 441 U.S. 520, 535, 99 S.Ct. 1861, 1871-72, 60 L.Ed.2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. Id. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. Constitutionally infirm practices are those that are punitive in intent, those that are not rationally related to a legitimate purpose or those that are rationally related but are excessive in light of their purpose. Id. at 538, n. 20, 99 S.Ct. at 1873-74, n. 20. The length of a detainee's confinement must also be considered in assessing the institution's practices. Bell v. Wolfish, 441 U.S. at 555, n. 35, 99 S.Ct. at 1882, n. 35; Hutto v. Finney, 437 U.S. 678, 686-87, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978) reh'g denied, 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1979); Campbell v. Cauthron, 623 F.2d 503, 507 (8th Cir.1980).
 
 
 17
 This formulation of the law, however, can be too general when the issue is whether individual defendants should have known that their conduct was prohibited. Anderson v. Creighton, 483 U.S. at 638-641, 107 S.Ct. at 3038-39, 97 L.Ed.2d at 530-31. An examination of past cases regarding the same or similar practices is sometimes required. Boswell v. Sherburne County, 849 F.2d 1117, 1121 (8th Cir.1988) (some but not precise factual correspondence required), cert. denied, --- U.S. ----, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989); Garcia v. Miera, 817 F.2d 650, 657 (10th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988); Kompare v. Stein, 801 F.2d 883, 887 (7th Cir.1986); Sourbeer v. Robinson, 791 F.2d 1094, 1104 (3rd Cir.1986), cert. denied, 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 779 (1987). Prison condition litigation has become quite common in the last thirty years. The questions presented are usually similar, and frequently do not involve academic or otherwise inaccessible analysis. For this reason, we are less inclined to feel that the applicable law in this area is a mystery, even to laymen. Whether the law is clearly established depends on what would be apparent in each situation. "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate * * *." Harlow v. Fitzgerald, 457 U.S. at 819, 102 S.Ct. at 2738 (emphasis added).
 
 
 18
 We therefore reject the per se rule advocated by the individual defendants. They argue that for the law to be clearly established, the specific acts of these officials must be particularly proscribed by decisions rendered by this Circuit or another court with direct jurisdiction over the institution. This rule would enable a jail official to claim immunity where several other circuit, district or state courts had condemned similar practices on the basis of the federal Constitution, so long as a Missouri court, or the district court for the Eastern District of Missouri or the Eighth Circuit had not yet done so. While the identity of a court and its geographical proximity may be relevant in determining whether a reasonable official would be aware of the law (as might the dissemination of information within the pertinent profession and the frequency of similar litigation), we do not think that the defendants' per se rule adequately captures what the Supreme Court has meant by its objective test for what is "clearly established." Harlow v. Fitzgerald, 457 U.S. at 819, 102 S.Ct. at 2738, Mitchell v. Forsyth, 472 U.S. at 535 n. 12, 105 S.Ct. at 2820 n. 12.[2] Because the defendants' reasoning does have some force, in deciding this appeal we have nevertheless been attentive to cases from within this circuit.
 
 B. Individual Liability
 
 19
 On appeal, the City Counselors urged that Mayor Schoemehl in particular should be dismissed because he cannot be held liable for conditions at the Jail. An official may be held responsible if culpability is established in one of three ways: personal administrative involvement, personal knowledge, or through the breach of a legal duty that proximately causes the injury. Sanders v. United States, 760 F.2d 869 (8th Cir.1985); McClelland v. Facteau, 610 F.2d 693 (10th Cir.1979); Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir.1978); Penick v. Columbus Board of Education, 519 F.Supp. 925, 927-28 (S.D.Ohio), aff'd 663 F.2d 24 (6th Cir.1981), cert. denied, 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982); Knight v. People of the State of Colorado, 496 F.Supp. 779, 781 n. 1 (D.Colo.1980). For example, in Boswell v. Sherburne County, 849 F.2d at 1122-23, we held that the sheriff could be liable for the decision of the officers present to delay medical attention for a pre-trial detainee, because a link might be established from their actions to the sheriff's duty to train and supervise. See City of Canton v. Harris, --- U.S. ----, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (liability of a municipality). In this case, plaintiffs' only allegation is that the City Charter, Art. VII sec. 1, places upon the mayor an affirmative duty of supervision.
 
 
 20
 Initially, given the usual generality inherent in a mayor's level of decision-making, and the fact that in this case, the mayor's authority was exercised through several layers of subordinates, he is not liable for the isolated actions of individual employees within the Jail that are contrary to jail policy or otherwise outside what should be the mayor's control and attention. There is no vicarious liability for such acts. Harris v. Pirch, 677 F.2d 681 (8th Cir.1982). Next, the mayor may be found liable for policy decisions only if he had personal knowledge of violations at the Jail, or he participated in decisions causing those violations, or in decisions foreseeably preventing their redress, or comparable omissions. He is not liable for any act occurring at the Jail merely because of his place in the City's hierarchy. Under this standard, before subjecting the Mayor to discovery regarding his personal knowledge, actions, and decision-making, we require that the plaintiffs point to some specific action or particular form of inaction which would make the Mayor liable under this standard. Anderson v. Creighton, 483 U.S. at 646 n. 6, 107 S.Ct. at 3042 n. 6, 97 L.Ed.2d at 535 n. 6. Plaintiffs have failed to do so in their amended complaint or supplementary materials. We therefore grant summary judgment for Mayor Schoemehl.
 
 III. Specific Allegations
 
 21
 In reviewing the constitutional adequacy of confinement conditions, we have always proceeded "with moderation so as to give the State an opportunity to solve independently the federal constitutional problems involved." Burks v. Teasdale, 603 F.2d 59, 62 (8th Cir.1979). We note that the City has improved the conditions at the Jail somewhat since previous litigation which found the totality of conditions unconstitutional. Johnson v. Lark, 365 F.Supp. 289 (E.D.Mo.1973) (prisoners beat into unconsciousness, denied food and medical care, and thrown into the "hole" for many days at a time without a hearing). Some of the less barbarous problems complained of then, however, seem to remain. Id. (mail, ventilation, recreation, sanitation, access to courts, medical care and food service). See also, Thomas v. Booker, 784 F.2d 299 (8th Cir.) (en banc), cert. denied, 476 U.S. 1117, 106 S.Ct. 1975, 90 L.Ed.2d 659 (1986) (disregard for individual's safety); Cummings v. Dunn, 630 F.2d 649 (8th Cir.1980) (denial of medical care).[3] We begin our review of the plaintiffs' principal claims with the recognition that, while clearly outrageous and brutal conduct seems on the wane, the Constitution also forbids other deprivations imposed by inadequate conditions of confinement. Hutto v. Finney, 437 U.S. at 685, 98 S.Ct. at 2570 (confinement of convicted prisoners).[4] The plaintiffs were confined for various lengths of time, commencing in February 1985, and until September 1986.
 
 A. Right to Counsel and Legal Materials
 
 22
 Pre-trial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials. When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised. Campbell v. McGruder, 580 F.2d 521, 531-32 (D.C.Cir.1978) (statistical disparity in convictions even when other factors are controlled).
 
 
 23
 Federal courts are not prison managers. Ordinarily we accord great deference to the internal administrative decisions of prison officials. * * * But where, as here, a prisoner alleges that a particular restriction imposed upon him by the prison officials impinges upon his exercise of constitutionally guaranteed rights, it is incumbent upon us to carefully scrutinize the effect of the restrictions. * * * It is clear that ready access to the courts is one of, perhaps the fundamental constitutional right.
 
 
 24
 Cruz v. Hauck, 475 F.2d 475, 476 (5th Cir.1973). See also, Adams v. Carlson, 488 F.2d 619, 630 (7th Cir.1973) ("All other rights of an inmate are illusory without it * * *.").
 
 1. The Allegations
 
 25
 Plaintiffs' pro se complaint alleged the following deprivation of due process rights: (1) an inadequate opportunity to consult with counsel, (2) no privacy during such consultations, (3) an inadequate law library and notarization service, and (4) the inadequate safeguarding of mail.
 
 
 26
 The plaintiffs alleged the following underlying facts. First, they were permitted access to a telephone for personal and legal purposes only twice a week. They were allowed only two calls, a twenty-minute phone call during the week and a ten-minute call on weekends. Affidavit of Arnold Hamilton-El at 2 (October 24, 1986); Affidavit of David Scott Hill-El at 1 (October 24, 1986); Affidavit of Tyrone Johnson-El at 1 (November 6, 1986). The only opportunity to call their attorneys was during the week; the weekday call, however, alternated each week between daytime and nighttime. Thus, they had one chance every two weeks to call their attorney's office. "Furthermore, when I attempted to telephone my attorney during the day and his line was busy or my attorney was away from his office, my allotted phone call was considered made and I had to wait another two weeks for another attempt." Affidavit of Hamilton-El at 2; see Affidavit of Hill-El at 1-2; Affidavit of Johnson-El at 2 (only one long distance call allowed per month affecting opportunity to contact New York attorney regarding extradition).
 
 
 27
 Moreover, when counsel was reached on the phone or visited, the plaintiffs allege that private consultation was impossible.
 
 
 28
 The phone was brought to the tier and phone calls were made in the open. There was so much noise in the background that I would have to yell in order to be heard. * * * When my attorney came to the jail to discuss my defense, no conference room was made available to us. We would meet in the lobby with guards and other jail staff always within hearing. Even though we would speak in a low voice, the guards were able to overhear our conversation.
 
 
 29
 Affidavit of Hamilton-El at 2; see Affidavit of Hill-El at 2; Affidavit of Johnson-El at 2.[5]
 
 
 30
 Finally, plaintiffs allege that the Jail law library was inadequate. While Jail policy allowed them one hour twice a week in the library to research and write, in fact they were only given one hour a week and went four at a time. Moreover, the Missouri codes describing the crimes they were charged with were outdated. Affidavit of Hamilton-El at 4; see Affidavit of Hill-El at 3-4; Affidavit of Johnson-El at 4. In addition, Tyrone Johnson-El alleges that restricted access to the law library was used as a punishment device to deter grievance filing. Affidavit of Johnson-El at 4-5.
 
 2. Clearly Established Law
 
 31
 These facts, if true, state violations of clearly established rights. Pre-trial detainees have a right to meaningful access to courts and to judicial process. Bounds v. Smith, 430 U.S. 817, 822, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977) (state prisoners); Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971). The City must provide its pre-trial detainees either with "adequate law libraries or adequate assistance from persons trained in the law." Bounds, 430 U.S. at 828, 97 S.Ct. at 1498. In this case, the City may have sufficiently constrained both avenues so as to violate plaintiffs' due process rights. Kelsey v. State of Minnesota, 622 F.2d 956 (8th Cir.1980).
 
 
 32
 The limited opportunity to consult with counsel in this case is as yet inadequately justified. "[I]nmates must have a reasonable opportunity to seek and receive the assistance of attorneys. * * * The extent to which that right is burdened by a particular regulation or practice must be weighed against the legitimate interests of penal administration * * *." Procunier v. Martinez, supra note 5, at 419-20, 94 S.Ct. 1814 n. 5. Here, no rationale has been offered for the Jail's particular phone system nor for counting calls as made where the attorney was not reached. Moreover, the ability of counsel to visit the Jail cannot always compensate for an inmate's initial inability to ask an attorney to visit. Worse yet, inmates who have not yet retained an attorney are obviously prejudiced if they can only make one call during business hours every two weeks. The phone system, if it is operated in this way, is patently inadequate. Compare Moore v. Janing, 427 F.Supp. 567, 576 (D.Neb.1976) (unlimited phone calls to retain an attorney and unlimited phone time with attorney of record); Jones v. Wittenberg, 330 F.Supp. 707, 719 (N.D.Ohio 1971) (phone rights of detainees to locate and to consult with counsel); see also Lathan v. Oswald, 359 F.Supp. 85 (S.D.N.Y.1973); Collins v. Schoonfield, 344 F.Supp. 257 (D.Md.1972). Defendant Booker grants that the phones are available on this restricted basis, but avers that the Jail is "in the process" of changing the phone system. Affidavit of Thomas M. Booker at 1 (July 2, 1986). This may pertain to the injunctive relief necessary but does not change our inquiry; further, we do not presume this is a concession on the merits.
 
 
 33
 Detainees' right to counsel and due process can also be compromised by a lack of privacy in consultations with counsel. Forcing prisoners to conduct their meetings with their attorneys in the open or to yell over the phone obviously compromises the consultation. Detainees might be hesitant to disclose names and information relevant to the attorney's investigation and necessary to the advice sought. Often pleas are changed in the months before trial based on counsel's assessment of the strength of each side's case. The right to an attorney would mean little if it did not effectively attach until the hushed whispers at the defense table the morning of trial, after counsel has selected her strategy and witnesses. Thus, as we have already stated, "[i]t is clear 'that an accused does not enjoy the effective aid of counsel if he is denied the right of private consultation with him.' " Mastrian v. McManus, 554 F.2d 813, 820-21 (8th Cir.), cert. den., 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977) (extensive citations omitted).[6] In this case, the plaintiffs allege that they were only allowed to meet with their attorneys in public areas of the Jail where their conversations could be overheard by guards and other prisoners. As the district court for Nebraska concluded from similar facts, "[s]uch conditions impede the detainees' ability to prepare for trial, jeopardize the confidentiality of their attorney-client communications and invade their right to privacy." Moore, 427 F.Supp. at 576. See Ahrens, 434 F.Supp. at 898; Berch v. Stahl, 373 F.Supp. 412 (W.D.N.C.1974); Souza v. Travisono, 368 F.Supp. 959 (D.C.R.I.1973), aff'd, 498 F.2d 1120 (1st Cir.1974); Jones, 330 F.Supp. at 719 (remedy ordered).
 
 
 34
 Inadequate library access and facilities may compound the problem. Even if detainees actually were given one hour twice a week in the library, as the City contends but plaintiffs dispute, this is obviously inadequate to research most legal claims. Williams v. Leeke, 584 F.2d 1336 (4th Cir.1978), cert. denied, 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979) (forty-five minutes three times a week usually so meager as to be unmeaningful); Nickl v. Schmidt, 351 F.Supp. 385 (W.D.Wis.1972) (two hours per week insufficient); McDonnell v. Wolff, 342 F.Supp. 616, 622 (D.Neb.1972) (seven hours per week unreasonable), aff'd on this ground, rev'd in part, 483 F.2d 1059 (8th Cir.), reh'g denied, 483 F.2d 1067 (1973) (per curiam), aff'd in part, rev'd in part, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (this issue not appealed).
 
 
 35
 It is certainly established that access to the legal system must be "meaningful." Bounds v. Smith, 430 U.S. at 823, 97 S.Ct. at 1495. We think reasonable officials would recognize in light of existing law that the phone restrictions, library restrictions and the lack of privacy for communications with attorneys, if true, are unconstitutional. Existing law makes clear that access to law libraries, lawyers and the courts is required for functional reasons. The mere existence of these avenues has never discharged the duty of similar defendants.
 
 
 36
 We stress that we express no view as to the truthfulness of plaintiffs' factual allegations. The governing law is clearly established, however, and these allegations are specific and state violations.
 
 B. Grievances
 
 37
 Plaintiffs allege that when they tried to use the internal grievance procedures, they were threatened with loss of their law library privileges. Affidavit of Johnson-El at 4-5. Tyrone Johnson-El reported that, together with Arnold Hamilton-El, he tried to submit a grievance to Captain Booker and Superintendent Brown. He alleges that Lt. Parks told them that he would have to review it first. Parks allegedly took the grievance from its envelope, read it and told the plaintiffs that he would not submit it. Allegedly, he threatened the plaintiffs with loss of their law library privileges if they continued to complain about "his jail." Plaintiff Johnson-El's Answer to Interrogatories at 9-10 (November 23, 1987); Plaintiff Hamilton-El's Answer to Interrogatories at 8 (November 20, 1987). Plaintiffs' complaint alleges that two other grievances were submitted without response. Complaint section IX. The plaintiffs submitted interrogatories to the City asking for the identification of all grievances submitted since 1985. The City refused to answer, alleging that the information requested was irrelevant, would not lead to discoverable evidence and was burdensome to produce. Defendant City of St. Louis' Answer to Plaintiff's Interrogatories at 14 (February 12, 1988).
 
 
 38
 Plaintiffs make two allegations of constitutional significance. First, threats to restrict access to the law library in retaliation for the use of the grievance system, joined with inadequate access to counsel, clearly violates their due process rights. Second, such threats obviously constitute punishment. Officials can no doubt enforce a code of conduct consistent with legitimate objectives and discipline detainees for the code's violations. Here, however, the grievance system exists to encourage the efficient and speedy resolution of disputes--literally preventing every unhappiness from becoming a "federal case." The prisoner is invited to submit complaints in lieu of litigation. To establish a grievance system whose use invites retaliation not only defeats the purpose for having the procedures, but it is obviously intended and otherwise constitutes punishment for the exercise of invited conduct. With respect to the underlying events alleged, the district court will have to separate out the liability of the various defendants according to the standards set forth earlier in our opinion.
 
 C. Health and Living Conditions
 
 39
 Plaintiffs also assert several claims regarding their health. First, they argue that the cafeteria and the food were infested with hair, roaches, worms and rodents as often as "every day or so." Affidavit of Hamilton-El at 3; Affidavit of Hill-El at 3; Affidavit of Johnson-El at 3. They observed mice where the food trays were and noticed that workers did not wear gloves or hair nets. Id. Food was often passed to each tier through "chuck holes" which were filthy and served as passage ways for many items, some unsanitary. A City health inspection of the kitchen conducted less than a month before the first of the plaintiffs was confined reveals continuing problems with food handling and storage, cleanliness and sewage in the kitchen. Inspection Report, Jan. 9, 1985 (Exhibit No. 2, Memorandum of Law in Opposition to Second Motion for Summary Judgment). An inspection made more than a month later, and after the relevant time period had commenced, revealed minimal improvement. Inspection Report, Feb. 12, 1985. The June report reveals some improvement in food handling, but continuing violations for all other problems, including the lack of hair restraints and clean clothes for the workers. Inspection Report, June 21, 1985.
 
 
 40
 Next, the plaintiffs allege that attempts to control the infestation of the Jail also adversely affected their health. According to the plaintiffs, the Jail sprayed pesticides in the public areas twice a month. While the sprayers wore masks and protective clothing, the inmates were confined in their cells and had to breathe the fumes. Affidavit of Hamilton-El at 3; Affidavit of Hill-El at 3; Affidavit of Johnson-El at 2. When asked which chemicals were used, the City refused to answer, responding that the information was irrelevant and would not lead to the discovery of admissible evidence. Defendant City of St. Louis' Response to Plaintiffs' Interrogatories at 20.
 
 
 41
 In addition, the plaintiffs complain generally of the sanitation in the living areas. They also allege that the lighting is so bad that they cannot read. Affidavit of Hill-El at 4; in this regard, see Martino v. Carey, 563 F.Supp. 984, 999 (D.Oregon 1983). During the confinement of the plaintiffs, the City itself realized that some sanitation problems at the Jail had reached the emergency stage. See The City Journal at 2, April 2, 1985 (Exhibit No. 2, Opposition to Second Motion for Summary Judgment).
 
 
 42
 Plaintiffs also allege that their medical care was inadequate. All parties agree that sick call was available only once a week. The City's answer to one of the plaintiffs' interrogatories suggests that medical attention outside of sick call was left to the discretion of the guards. Response to Interrogatories at 21. Specifically, David Hill-El alleges that he was not able to get examinations upon request; he had to file a grievance in order to see a doctor. He alleges that he suffered from pain and problems caused by an auto accident and by a bullet that remained lodged in his head. Yet, when he was able to receive attention, medical records were either not kept or not used to assist in treatment. Affidavit of Hill-El at 3. The other plaintiffs make similar complaints. See, e.g. Affidavit of Hamilton-El at 304 (pain and suffering including inadequate dental care). Tyrone Johnson-El alleges that he suffered from asthma, migraines and a head wound. His complaints were screened by "PAs" who alternatively told him that nothing was wrong with him or promised him that he would see a doctor.[7] When he was allowed to see a doctor, he alleges that he had to wait two weeks and sometimes a month before the visit. Johnson-El's Answers to Defendant City of St. Louis' Interrogatories at 6-9.
 
 
 43
 These allegations state violations of clearly established rights. Counsel for the City conceded at oral argument that plaintiffs' sanitation and medical care claims stated the clearest violations. There is no dispute, for example, that kitchen sanitation must be maintained and that workers must observe personal hygiene, including the use of gloves and hair nets. Heitman v. Gabriel, 524 F.Supp. 622, 627 (W.D.Mo.1981). What may be novel about this case is that one of the steps the City has taken to combat facility-wide rodent infestation is also alleged to cause health problems.
 
 
 44
 Other cases dealing with the spraying of noxious fumes have concerned the use of tear gas or mace to quell disturbances. In many cases, absent shocking circumstances, the need for order has outweighed many health claims. See, e.g., 51 A.L.R.3d 111, 152-56 (collecting cases). Here, too, there is good reason to allow Jail officials both the opportunity to combat the dilemma and some deference to their choice of means. It is clearly etsablished, however, that prison officials may not be deliberately indifferent to a prisoner's health. Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), reh'g denied, 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977); Toombs v. Bell, 798 F.2d 297, 298 (8th Cir.1986); Kelsey v. Ewing, 652 F.2d 4 (8th Cir.1981).[8] For this reason, dismissing this allegation on qualified immunity grounds would be inappropriate. For without disclosure by the City of what chemicals were used, we cannot say that plaintiffs would not be able to show that the defendants acted indifferently.
 
 
 45
 The plaintiffs' complaints regarding the delay in the availability of medical services and the failure to maintain records are more common. Delay in the provision of treatment or in providing examinations can violate inmates' rights when the inmates' ailments are medically serious or painful in nature. Toombs; Heitman, 524 F.Supp. at 627; Ramos v. Lamm, 485 F.Supp. 122, 158 (D.Colo.1980), aff'd in part, rev'd on other grounds, 639 F.2d 559 (10th Cir.1980), cert. den., 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); Todaro v. Ward, 431 F.Supp. 1129, 1132-33 (S.D.N.Y.), aff'd, 565 F.2d 48 (2nd Cir.1977). The defendants may be liable for failing to train the guards to screen the detainees' medical complaints. City of Canton v. Harris, --- U.S. ----, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) Patzner v. Burkett, 779 F.2d 1363, 1367 (8th Cir.1985). The keeping of medical records is also a necessity. Hutchings v. Corum, 501 F.Supp. 1276, 1288, 1297 (W.D.Mo.1980). Once again, plaintiffs' allegations are sufficient to state violations of clearly established rights. Reasonable officials should know that certain rudiments of medical service must be maintained.CONCLUSION
 
 
 46
 We believe that the magistrate was correct in declining to dismiss this case. These motions were commenced at an early stage of the litigation, before important discovery could be conducted. The allegations are specific and find some support even outside the plaintiffs' affidavits. They are not the bare accusations of malice which troubled the Court in Harlow. The defendants may bring more refined motions for summary judgment after cooperative discovery is further along. At that time, the magistrate will have to carefully analyze each claim in assessing the sufficiency of the plaintiffs' case.[9] Accordingly, the order denying defendants' motion is affirmed, except that summary judgment is granted to Mayor Schoemehl in his individual capacity.
 
 
 
 *
 The HONORABLE GERALD W. HEANEY assumed senior status on December 31, 1988
 
 
 [1]
 Mitchell involved only a claim for damages. The plurality opinion left open whether any collateral review of qualified immunity claims was similarly available when a claim for injunctive relief was also present, requiring adjudication regardless of the outcome of the qualified immunity claim. 472 U.S. at 519, n. 5, 105 S.Ct. at 2811-2812, N. 5. We had previously held that review is available even where both types of relief are sought. Tubbesing v. Arnold, 742 F.2d 401, 403-04 (8th Cir.1984)
 
 
 [2]
 The cases cited by the defendants do not dissuade us. See Davis v. Holly, 835 F.2d 1175 (6th Cir.1987) (a single "novel" opinion from another jurisdiction does not create clearly established law); Knight v. Mills, 836 F.2d 659 (1st Cir.1987); Hoang Ha v. Schweiker, 707 F.2d 1104 (9th Cir.1983) (a single contrary district court opinion from another jurisdiction that did not consider all the issues raised does not make the government's position unreasonable)
 
 
 [3]
 Counsel for both sides urged in their briefs and at oral argument that a number of unreported district court decisions regarding this facility were helpful in determining what the Jail officials may have thought they were required to do. At the end of oral argument, we requested each side to make those decisions part of the record if they wanted us to consider the effect of the decisions. Counsel for the defendants subsequently submitted three brief opinions to us, one of which post-dates the relevant time period. None of these opinions reveal what specific underlying factual allegations were presented to the court and they are all therefore unhelpful
 
 
 [4]
 Many of the persistent problems alleged to exist at the Jail, and which concern us here, have always been generated by the condition of the facility. Judge William H. Webster remarked sixteen years ago:
 General living conditions in city jail at the time of the filing of this action, as detailed supra, were unquestionably deplorable. The facility was then, and is now, antiquated and outmoded, and its capacity to house prisoners awaiting trial is inadequate for today's demands. The quality of care and treatment of the prisoners within that institution is but a reflection of the physical decay of the institution itself.
 
 
 [365]
 F.Supp. at 301. While we have never required the City to replace the Jail, nor have they done so, we have always patiently insisted that it be maintained in a constitutional manner. See Ahrens v. Thomas, 434 F.Supp. 873 (W.D.Mo.1977) (substantially closing county jail and issuing specifications for new facility), aff'd in part and modified in part, 570 F.2d 286 (8th Cir.1978) (reclassifying the district court's specifications for the new jail as suggestive guidelines)
 
 
 [5]
 These problems were allegedly compounded by the inadequate handling of written communications. Arnold Hamilton-El alleges that a petition he mailed to a court was never received. He also alleges that a habeas corpus petition he requested mailed was misplaced and found sitting at the front desk two weeks later. He further claims that because there are no mail boxes or protective devices for incoming mail, that possibly his mail has been lost or stolen. Affidavit of Hamilton-El at 5. See Procunier v. Martinez, 416 U.S. 396, 412-14, 94 S.Ct. 1800, 1810-11, 40 L.Ed.2d 224 (1974); Woods v. Aldworth, 561 F.Supp. 891 (N.D.Ill.1983). If the plaintiffs are unable to prove more than negligence with regard to mail service, this allegation will have to be dismissed as an independent basis for individual liability
 
 
 [6]
 In Mastrian, the defendant alleged that because another inmate had eavesdropped on his conversations with his attorney, he was entitled to a new trial. We rejected Mastrian's challenge to his conviction because the substance of the conversations were not relayed to the authorities or used by them. Accord United States v. Morrison, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564, reh'g denied, 450 U.S. 960, 101 S.Ct. 1420, 67 L.Ed.2d 385 (1981); United States v. Mastroianni, 749 F.2d 900 (1st Cir.1984) (preservation of informant's cover a permissible rationale for attendance at meeting with counsel so long as there is no disclosure); United States v. Davis, 646 F.2d 1298 (8th Cir.), cert. denied, 454 U.S. 868, 102 S.Ct. 333, 70 L.Ed.2d 170 (1981)
 
 
 [7]
 We believe that "P.A." stands for physician assistant. We do not know what qualifications are required for the position or whether the P.A.s are nurses, prisoners or guards
 
 
 [8]
 The deliberate indifference standard is used in assessing claims of medical deprivation to measure the rights of convicted prisoners to be free of cruel and unusual punishment. Because pre-trial detainees are entitled to be free of all but incidental punishment, and in light of their inability to elect medical treatment and supplies as can unconfined defendants, a more stringent standard should be appropriate in assessing their claims of inadequate medical care. This is especially so where, as here, the detainees were confined for very long periods of time. What such a standard should be, however, has been subject to discussion but is not yet clearly established. See Boswell, 849 F.2d at 1121. Thus, for the purpose of this appeal, we use the deliberate indifference standard
 
 
 [9]
 For example, if the motions are renewed, the magistrate will have to resolve whether the plaintiffs' complaints about denial of the opportunity to worship state a claim. The only explanation offered by the defendants was in the form of an affidavit by L.T. Brown, attached to the defendant's third motion. The plaintiffs had no opportunity to respond to the affidavit because the magistrate, believing that the second and third motions were identical, denied the third motion immediately