Cindy Louise CROSS, Appellee,

v.

CITY OF DES MOINES, John Woolsey;
Dennis Rich, Appellants.

Cindy Louise CROSS, Appellee,

v.

CITY OF DES MOINES, Appellant,

John Woolsey; Dennis Rich.

Nos. 91–1425, 91–2102.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 12, 1991.

Decided May 28, 1992.

Steven Lussier, Des Moines, Iowa, argued, for appellants.

Thomas Mann, Jr., Des Moines, Iowa, argued, for appellee.

Before BEAM, Circuit Judge, HEANEY, Senior Circuit Judge, and LOKEN, Circuit Judge.

BEAM, Circuit Judge.

Cindy Louise Cross filed this lawsuit, pursuant to 42 U.S.C. § 1983, claiming that her Fourth Amendment rights were violated when her apartment was searched by John Woolsey and Dennis Rich, police officers for the city of Des Moines, Iowa. Woolsey, Rich, and the City appeal the district court's denial of their summary judgment motion, claiming entitlement to qualified immunity. We reverse.

I. BACKGROUND

According to the uncontradicted deposition testimony of Woolsey and Rich, the two officers were on patrol together in a paddy wagon in the city of Des Moines on the afternoon of June 3, 1988. At about 3:30 p.m., the officers saw a man whom they believed was Floyd Cross (appellee's husband) driving a gold and white Cadillac. The officers reported the automobile's license number to a police dispatcher. The dispatcher informed the officers that the car was registered to a Cindy Cross, who resided at 1821 Woodland. The dispatcher also confirmed the officers' suspicion that there was an outstanding felony arrest warrant for Floyd Cross.

Neither of the officers apparently saw the face of the driver of the Cadillac, but a number of factors led them to believe it was Floyd Cross driving the car. First, although it had been about six months since Officer Woolsey had seen either Floyd Cross or the Cadillac, Woolsey had

been involved in two previous encounters with Floyd Cross while Floyd Cross was driving the car and Woolsey remembered the license plate number of the car from these earlier episodes. Joint Appendix at 224. Second, on one occasion two or three years prior, when Woolsey had arrested Floyd Cross, Floyd Cross had been driving a black Chrysler registered to "Cindy Laughlin." On that occasion, Floyd Cross had stated to Woolsey that Cindy Laughlin was his wife. *Id.* at 271. Third, the person whom the officers saw driving the car on June 3 was a "black male of large stature" or with a "pretty stocky build," thus at least partially resembling Floyd Cross. *Id.* at 223, 294. What neither Woolsey nor Rich knew on June 3, however, was that Floyd Cross was in jail in Rock Island, Illinois. The driver of the car that afternoon was likely an employee of the automotive shop where Cindy Cross had taken the car for repairs earlier in the day. *Id.* at 37–39.

After sighting the person they thought was Floyd Cross, Woolsey and Rich tried to follow the car. They lost sight of it, however, in the city's traffic. *Id.* at 223–24, 291–93. The officers then requested that an announcement be broadcast to other patrol cars in Des Moines stating that Floyd Cross had been seen driving the Cadillac and that the vehicle should be stopped and its driver held. Just before losing sight of the car, the officers noticed that it was headed in an easterly direction—not in the direction of 1821 Woodland. The officers thus drove to two addresses in that direction where they thought they might find Floyd Cross. *Id.* at 226–27. Cross, of course, was not at either address. The regular patrol duties of the officers kept them occupied thereafter until about 6:30 p.m., when they drove to 1821 Woodland. *Id.* at 227–29.

At 1821 Woodland, an apartment building, the officers found the Cadillac parked in the building's lot. After failing to find Cindy Cross's name on the building's mailboxes, Woolsey and Rich asked the building manager, Donna Grossman, where Cindy Cross lived. *Id.* at 203, 229, 299. Grossman apparently inferred from the question that something might be wrong with Cindy Cross. Grossman ran down the building's hallway and into Cross's apartment, the door to which was open, shouting, "Cindy, Cindy, are you alright?" *Id.* at 48, 203, 208. Woolsey and Rich followed Grossman to the apartment.

At this point, the police officers' account of what happened differs from that of Cindy Cross. According to Woolsey and Rich, the officers knocked on Cross's open door and asked if Floyd Cross was home. *Id.* at 229–31, 299–301. Cindy Cross replied, "What has he done now?" *Id.* at 301. Woolsey and Rich explained that they had an arrest warrant for Floyd Cross. Cindy Cross responded that Floyd was in jail in Rock Island, Illinois. *Id.* at 233, 301. The officers asked her if they could search her apartment and she responded with words to the effect, "Go ahead." *Id.* at 233–34, 302. The officers then searched the apartment, looking everywhere an adult could hide, without objection from Cindy Cross. *Id.* at 238–39, 303–04. After the officers completed their search, Cindy Cross asked them, "Don't you guys need a search warrant?" *Id.* at 240. The officers reminded her that she had consented to the search and also told her that a search warrant was not necessary because there was an outstanding arrest warrant for Floyd Cross. *Id.* at 239–40.

Cindy Cross's version of the events and conversation is different. Woolsey and Rich, according to Cross, entered her apartment through the door left open by the manager. *Id.* at 49–50. One of the officers asked her the whereabouts of Floyd Cross and told her that Floyd Cross had been seen driving her car earlier in the day. *Id.* at 50. As the officers moved through her apartment, Cindy Cross explained to them that she had taken her car to a repair shop earlier that day and that the person seen driving the car was probably a repairman. *Id.* at 52. While the officers searched her apartment, Cindy Cross asked them, "Don't you need a search warrant to search my home?" *Id.* The officers explained that it was not necessary because they had an arrest warrant for Floyd

Cross. *Id.* at 52–53. Sometime before the search was complete, Cindy Cross told the officers that Floyd Cross was in jail in Rock Island, Illinois (which the officers confirmed several days later). *Id.* at 54, 323.

Cindy Cross filed a complaint in district court in July 1988, alleging, among other points, that Woolsey, Rich, and the City had violated her Fourth Amendment rights when the officers searched her apartment. Woolsey, Rich, and the City filed a motion for summary judgment. They argued, in part, that the officers were entitled to qualified immunity for their actions because the search was conducted on the basis of the arrest warrant for Floyd Cross and with probable cause to believe Floyd Cross was in the apartment, or, in the alternative, that Donna Grossman's behavior in rushing into Cross's apartment created exigent circumstances that allowed them to search the apartment.

The district court denied the summary judgment motion. The court concluded that a question of material fact exists as to whether there was probable cause to believe Floyd Cross was in the apartment. The district court also concluded that the question of exigent circumstances required further development at trial. *Cross v. City of Des Moines, et al.,* No. 88–1261–E, Order at 5, 7–8 (S.D.Iowa Jan. 10, 1991). Woolsey and Rich now appeal the district court's decision.[1] *See Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985) (a district court's denial of a claim of qualified immunity, "to the extent that it turns on an issue of law," is an appealable final decision under the collateral order doctrine).

## II. DISCUSSION

The Supreme Court noted in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), that "[w]hen government officials abuse their offices, 'action[s]

for damages may offer the only realistic avenue for vindication of constitutional guarantees.'" *Id.* at 638, 107 S.Ct. at 3038. (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982)). The Court also acknowledged, however, that "permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Id.* To accommodate "these conflicting concerns" the Supreme Court has "generally provid[ed] government officials performing discretionary functions with a qualified immunity." *Id.* Qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant,* — U.S. ——, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)).

The test for determining when an official is entitled to this protection was set forth by the Supreme Court in *Harlow v. Fitzgerald.* According to *Harlow,* law enforcement officers are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. In the ten years since the *Harlow* decision, the Supreme Court (as well as other federal courts) has further explained the nature of this test.

One of the Court's most recent statements is in *Siegert v. Gilley,* — U.S. ——, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), where the Court attempted to "clarify the analytical structure under which a claim of qualified immunity should be addressed." *Id.* at 1793. According to *Siegert,* a court must first determine whether "the plaintiff

---

1. During the discovery stage, Cross requested documents from the City relating to civilian complaints about other police searches. The City denied this request, but the district court later ordered that the information be produced. The City appeals from that order (case no. 91–2102), which was certified by the district court under 28 U.S.C. § 1292(b). Because we hold that the officers did not violate the Constitution, we address this issue only briefly at the conclusion of this opinion.

has asserted a violation of a constitutional right at all." *Id.* If no constitutional right has been asserted, the plaintiff's lawsuit must be dismissed. "Decision of this purely legal question permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits." *Id.*

Determination of whether a constitutional right has been asserted is a "necessary concomitant" to the next step, which is to decide whether the constitutional right in question was "clearly established." *Id.* This question is also an objective, "essentially legal question." *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815. For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. The "very action in question" need not have been previously held unlawful, but "in the light of pre-existing law the unlawfulness must be apparent." *Id.* Although "[d]efendants bear the initial burden of coming forward with facts to suggest that they were acting within the scope of their discretionary authority," the *plaintiff* must demonstrate that the law allegedly violated was clearly established. *Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1095 (6th Cir.1992); *see also Johnson–El v. Schoemehl,* 878 F.2d 1043, 1048 (8th Cir. 1989).

Next, if the plaintiff can show that the defendant's conduct violated clearly established law, "then the defendant, as the movant for summary judgment, must demonstrate that no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and the information the defendant possessed at the time of his actions." *Salmon v. Schwarz,* 948 F.2d 1131, 1136 (10th Cir.1991); *cf. Johnson–El,* 878 F.2d at 1048 ("The defendant bears the burden of proof with respect to all other elements of the defense...."). If there is no genuine issue as to any material fact pertaining to the objective reasonableness of the de-fendant's action, then the defendant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).

If a case involves a question of whether probable cause existed to support an officer's actions, the case should not be permitted to go to trial if there is *any* reasonable basis to conclude that probable cause existed. *Hunter,* 112 S.Ct. at 537. It is not necessary, in other words, for a defendant to show that " 'there is only one reasonable conclusion a jury could reach' " on whether there was probable cause. *Id.* (quoting *Bryant v. United States Treasury Dep't, Secret Service,* 903 F.2d 717, 721 (9th Cir. 1990)). A standard such as that would "routinely place[ ] the question of immunity in the hands of the jury." *Id.* A court should ask, rather, "whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed." *Id.* With these principles and analytical structure in mind, we now consider this case.

■ Cross alleges that Woolsey and Rich violated her Fourth Amendment right to be secure in her home against unreasonable searches. Aside from this general allegation, however, it is not obvious from Cross's argument on appeal exactly what clearly established constitutional right she claims Woolsey and Rich violated. We see two possible lines of argument in her brief.

First, Cross claims that under Fourth Amendment law at the time of the search "it was clearly established that police authorities could not search her home, in the absence of her consent, a search warrant, or exigent circumstances." Brief for Appellee at 8. Cross maintains, if we understand her correctly, that the Fourth Amendment admits of no other circumstances in which a search could take place and that the officers, under no circumstances, could enter her apartment for the purpose of executing an arrest warrant. Thus, because these conditions (i.e., consent, a search warrant, or exigent circumstances) either did not exist or are in dis-

pute, summary judgment for the officers is unwarranted.

We will devote little time to this argument. Cross may be asserting a constitutional right, as required by *Harlow* and *Siegert*, but she has not demonstrated that her statement expresses applicable legal principles clearly established at the time of the search. In support of her position, Cross simply quotes general principles arising from the Fourth Amendment and cites two cases, *Anderson v. Creighton* and *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), neither of which stands for the proposition she advances. Brief for Appellee at 6–8. This of course is understandable, for the Fourth Amendment is not so narrowly applied as Cross would have us believe. Long before Cindy Cross's apartment was searched, in fact, the Supreme Court had noted that an arrest warrant, under certain circumstances, carries with it a limited authority to search a dwelling. *See, e.g., Payton v. New York,* 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980) ("an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within").

Cross's alternative argument, again, if we understand her correctly, is a more plausible one, but it is hardly more developed in her brief than the one described above. She seems to assert that it was clearly established law that an officer could search her apartment under the authority of the arrest warrant for Floyd Cross but only *if* the officer had reason to believe Floyd Cross resided at her apartment and only *if* the officer had reason to believe or probable cause to believe that Floyd Cross was in her apartment at the time of the search. Cross does not provide any case law to establish that this was a clearly established standard of law; instead, she seems to rely solely on the dictum in *Payton,* quoted in the parenthetical above, to support her claim.[2] Cross argues further that because these conditions either did not exist or are material facts in dispute, summary judgment was properly denied by the district court.[3]

We are not certain whether this was clearly established law at the time Cross's apartment was searched or at any other time. In June 1988, there was, as the officers and the city point out in their brief, a paucity of relevant cases. It was not entirely clear what degree of certainty of knowledge an arresting officer had to have with respect to the status of the dwelling as the residence of the arrestee or the likelihood that the arrestee was present in the dwelling at the time it was searched. In other words, the contours of the Fourth Amendment with respect to searches of dwellings during the execution of an arrest warrant were not so clear that a reasonable officer could have understood that what Woolsey and Rich were doing violated the Constitution. Thus we are inclined to hold

**2.** Cross does not so much assert that this was the clearly established law as she concedes—in response to the appellants' argument that the law was unclear—that it might have been the law. *See* Brief for Appellee at 8–9. Cross, in fact, seems to have a fundamental misunderstanding of how a qualified immunity claim is analyzed. In support for their defense of qualified immunity, Officers Woolsey and Rich came forward with facts to suggest that they were acting within the scope of their discretionary authority (i.e., they had an arrest warrant for Floyd Cross and reason to believe he was in Cindy Cross's apartment). But Cindy Cross has not responded—as is her burden—by showing that the officers in fact violated a clearly established right. Indeed, Cross's entire argument on appeal seems to ignore the fact that this is her burden. If Cross does not explain what clearly established right was violated as precisely and

thoroughly as possible, including, especially, a discussion of the relevant cases, we are only left to speculate as to what her claim may be.

**3.** The dissent asserts that the officers had "several hours" in which to secure a search warrant and implies that they should have done so rather than relying upon the arrest warrant. This statement is somewhat at odds with the dissent's argument that on the facts probable cause to search did not exist. A magistrate would have needed a showing of probable cause for the issuance of a search warrant. U.S. Const. Amend. IV. On the other hand, the arrest warrant coupled with reasonable cause to believe that Floyd Cross lived at this location and was present at the time brought the search within the holding of *Payton v. New York.*

that Cross has not asserted a clearly established right. But we will assume, however, for the purpose of analysis, that Cindy Cross has indeed stated clearly established law as of June 1988. For even if we do, there can be no question that Woolsey and Rich did not violate the law: the officers had reason to believe that Floyd Cross resided at Cindy Cross's apartment and they had reason to believe that Floyd Cross was in her apartment when the search was conducted. From the undisputed evidence, any reasonably objective officer would have had a similar state of mind.

Cross argues that Woolsey and Rich merely observed an unidentified black man driving a vehicle registered to Cindy Cross; that the officers had no reason to believe that Floyd Cross was married to her; and, at the time the officers arrived at her apartment, that the officers had no reason to believe that Floyd Cross was in her apartment. Cross quotes deposition testimony like the following as support:

> [Thomas Mann, Jr., Cross's Attorney:] What information did you have in your possession to believe that Floyd Cross was inside Mrs. Cross' apartment?
>
> [Officer Woolsey:] The information we had? None. That's why her permission was asked.

*Joint Appendix* at 253.

It is true that Woolsey and Rich did not get a good look at the driver of the car that afternoon, but the officers believed nevertheless that they had seen Floyd Cross. This belief was not, as indicated, unreasonable. Officer Woolsey had had two previous encounters with Floyd Cross while Floyd Cross was driving that particular car; and, on a prior occasion, Woolsey had

arrested Floyd Cross while he was driving a car registered to "Cindy Laughlin," who was identified by Floyd Cross as his wife, and the Cadillac the officers saw that afternoon was registered to a Cindy Cross. It would not take a great leap of faith for an officer to reasonably believe he had seen Floyd Cross driving his wife's car, and, after finding the car parked outside Cindy Cross's apartment a few hours later, to believe that Floyd Cross was inside with his wife.

With respect to the deposition testimony of Officer Woolsey, we agree with the officers and the City that statements used by Cross are being taken out of context, for Woolsey evidently misinterpreted the questions presented by Cross's attorney. This misunderstanding is cleared up in a few places in the transcript. We give one as an example:

> [D.J. Stovall, Attorney for Woolsey and Rich:] Officer, in response to a question by Mr. Mann as to whether or not you had anything in your possession that would indicate to you that Floyd Cross was in the apartment that Cindy Cross resided in, you indicated that you did not have anything in your possession when you responded. Were you referring to physical documents?
>
> [Officer Woolsey:] That's correct.

*Id.* at 270–71. Officer Woolsey, as this quotation indicates, was not suggesting in his deposition that they had no reason to believe Floyd Cross was in Cindy Cross's apartment. The uncontroverted evidence is to the contrary.[4]

---

4. With respect to the question of on what basis the officers searched Cross's apartment, the dissent ignores the full record. The dissent quotes only Officer Woolsey's statements (also quoted by the district court) that if he did not have Cindy Cross's consent to search the apartment, he would not have done so. The dissent thus contends that consent was the only basis for the officers' search.

Both officers made it clear in their deposition testimony, that they understood the law to be that they needed probable cause in addition to the arrest warrant in order to search the apartment. Both officers also stated that they

searched the apartment on the basis of Cindy Cross's consent *and* their reason to believe Floyd Cross was in the apartment. Officer Woolsey explained, We "[h]ad both." *Joint Appendix* at 243. Officer Rich stated the same:

> [Cross's Attorney:] Okay. So, I would like it to be clear for the record, were you relying on her consent alone or were you relying on both her consent and the fact that you had an arrest warrant on file?
>
> [Officer Rich:] Both.

*Id.* at 286. The dissent is reading the record narrowly and ignoring the extent of both officers' statements.

■ Cindy Cross also argues that even if Woolsey and Rich were authorized to search her apartment, the officers still violated the Fourth Amendment by not having the warrant in their possession for her to inspect. Cross cites no cases to support her position that this was a violation of a clearly established right (and we know of none). The only case she mentions in her brief is *Sabbath v. United States*, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968), and she cites this case only for the general proposition that warrants serve to advise people of a law enforcement officer's authority. Thus, Cross, again, fails to establish the violation of a clearly established right.[5]

Finally, we note that Cindy Cross makes no allegation that Woolsey and Rich's search of her apartment in any way violated other constitutional rights. She does not assert, for example, that the search of her apartment was excessive in the sense that the search extended to parts of the premises where Floyd Cross could not be found. In fact, the parties seem to be in general agreement that Woolsey and Rich searched only those rooms or areas where Floyd Cross could have been hiding. Nor does she claim Woolsey and Rich violated the Constitution by their method of entry into her apartment. Her only allegations are those which we have dealt with above, and we find them to be without merit.

## III. CONCLUSION

We conclude that Cindy Cross has not established that Woolsey and Rich violated the Constitution, whatever maxims of Fourth Amendment law may have been in place at the time of the search. Thus, for the reasons stated, the judgment of the district court is reversed as to Woolsey and Rich and this case is remanded for judgment in conformity with this opinion. We do not believe that the district court abused

its discretion on the discovery issue appealed by the City. That order is affirmed. Because the section 1983 action against the city of Des Moines, Iowa, is not before us for review, we, of course, express no opinion on that claim. We do, however, wish to call the district court's attention to *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1980), a decision that addresses the degree of fault and causation that must be evidenced before municipal liability will be permitted.

HEANEY, Senior Circuit Judge, dissenting.

It is difficult for me to believe that a majority of this panel is determined to overrule the district court. Contrary to the majority, I do not have any problem understanding Cindy Cross's theory of the case. She simply contends that the officers did not have consent to enter her apartment, that the officers did not have probable cause to do so, and that exigent circumstances justifying an entrance without a search warrant were not present. It is clear to me that the district court correctly decided that summary judgment was not appropriate here because genuine questions of material fact exist as to (1) whether the defendants had reasonably trustworthy information to believe that Floyd Cross was in Cindy Cross's apartment, and (2) whether or not Cindy Cross consented to the search of her apartment.

As to consent, the full record with respect to this contention is contained in the district court's opinion at pages 4–5. It reads as follows:

Q. What information did you have in your possession to believe that Floyd Cross was inside Mrs. Cross' apartment?

A. The information we had? None. That's why her permission was asked.

Q. You had none and that's why her permission was asked, is that correct?

---

5. Indeed, the relevant cases in this circuit suggest that the clearly established law in June 1988 was directly contrary to Cross's claim. *See, e.g., United States v. Hepperle*, 810 F.2d 836, 839 (8th Cir.) (noting that it is not unconstitutional to proceed with a search in the absence of the physical presence of the search warrant),

*cert. denied*, 483 U.S. 1025, 107 S.Ct. 3274, 97 L.Ed.2d 772 (1987); *Washington v. Simpson*, 806 F.2d 192, 196 n. 4 (8th Cir.1986) ("federal constitutional law does not require the actual possession of a warrant if the arresting officer has knowledge of its existence").

A. That's correct.

(Deposition of Officer Woolsey, page 36, lines 15–22.)

Officer Woolsey was also asked:

Q. You had no probable cause and therefore you asked for her consent, is that correct?

Mr. Lussier: Same objection as previously.

A. We had felt that—we believed Floyd had gone to the apartment. That's what I'm telling you.

Q. But you also told me that you had no information to justify that and that's why you asked for her consent, isn't that what you told me?

A. You were referring to what things we had in our possession to prove or to say that he was actually there. We had nothing to say that he was actually there.

Q. Is that why you asked for her consent?

A. That's correct.

(Deposition of Officer John Woolsey, page 37, lines 9–22.)

Officer Woolsey responded further to the following questions:

Q. Do you contend that you had probable cause?

A. Sir, it is my feeling that with her consent we're not working on probable cause.

Q. Do you contend that you had it despite not needing it?

A. Had she refused, if that's your question, we would not have gone into that apartment.

(Deposition of Officer John Woolsey, page 42, lines 1–7.)

In my view, a factfinder could conclude, based on a reasonable reading of the deposition testimony presented to the district court, that the officers relied exclusively on Cindy Cross's alleged consent to enter the apartment. We should give the factfinder an opportunity to do so.

The majority further asserts that the officers, as a matter of law, had reason to believe both that Floyd Cross resided at Cindy Cross's apartment and that Floyd Cross was in the apartment when the search occurred. The officers said they reasonably believed that Floyd Cross resided in his former wife's apartment because they saw a man resembling Floyd Cross driving Cindy Cross's car and because they subsequently found the car parked at Cindy Cross's apartment. Perhaps a factfinder would accept this explanation, but we should not find the officers' belief to be reasonable as a matter of law. Thousands of black men living in Des Moines may match the officers' vague description. In my view, a factfinder could reasonably conclude that the officers merely speculated that Floyd Cross was driving the car and that the probable cause required to justify the intrusion into Cindy Cross's home was absent.

There is one additional matter that deserves discussion. Before the district court, the officers argued they did not need a search warrant to enter Cindy Cross's apartment because they had probable cause to do so and because exigent circumstances permitted their entry into the apartment. The district court determined that this issue was not ripe for summary judgment. It did so for very good reasons. First, between the time they saw the black man driving Cindy Cross's car and the time of the search, the officers had several hours to secure a search warrant. Second, Cindy Cross's hands and arms are missing. This handicap explains the landlady's concern when the officers appeared on the scene. The record however, does not indicate whether the officers were aware of her condition. If they were, this knowledge undercuts the officers' claim that the landlady's alarm signaled the presence of exigent circumstances.

The fact is that not only were the officers totally insensitive to Cindy Cross, but they might have violated her privacy by charging into her apartment without her consent and without probable cause. Had they asked one simple question of Cindy Cross when they arrived at her apartment—"Who was the black man driving your car earlier today?"—they would not have invaded her privacy. Instead, they

paid no respect to her and entered her apartment (possibly) without either her consent or probable cause.

It may be that if we follow the decision of the district court and remand for trial, the officers could establish at trial that they reasonably believed Cindy Cross had given her consent. If that is the case, they would be entitled to a verdict, but they certainly have not established that fact at this point. It may also be that on full development of the facts at trial, the officers could convince a jury that they reasonably believed they had probable cause to enter the apartment, but the facts have not been fully developed at this point. Despite the majority's conclusion to the contrary, genuine issues of material fact exist regarding both of these issues. Therefore, I would affirm the district court and direct that this case proceed to trial.